# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JUNE 15, 2017
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2016-SC-000127-MR

FINAL

DATE 7/6/17 Kim Redmon, DC

SHAUN HILES          APPELLANT

ON APPEAL FROM GRANT CIRCUIT COURT
V.     HONORABLE GREGORY M BARTLETT, SPECIAL JUDGE
NO. 14-CR-00213

COMMONWEALTH OF KENTUCKY          APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Appellant, Shaun E. Hiles, appeals from a judgment of the Grant Circuit Court convicting him of two counts of murder and two counts of first-degree wanton endangerment. As a result of these convictions Appellant was sentenced to imprisonment for life without the possibility of parole on each of the two murder convictions and to a term of imprisonment for five years on each wanton endangerment charge.[1]

---

[1] The judgment reflects that the wanton endangerment sentences are to be served consecutive to one another. The judgment is silent with respect to the running of the life sentences. However by operation of law, such sentences run concurrently with other simultaneously imposed sentences. "[N]o sentence can be ordered to run consecutively with such a life sentence in any case, capital or non-capital." *Bedell v. Commonwealth*, 870 S.W.2d 779, 783 (Ky. 1993).

As grounds for appellate relief, Appellant raises the following six arguments: (1) the Commonwealth elicited inadmissible opinion testimony concerning whether he was acting under extreme emotional disturbance (EED) at the time of the shootings; (2) he was prejudiced by improper testimony describing him as being upset and cursing in the hours preceding the crime; (3) the prosecutor engaged in improper closing arguments by misstating the applicable EED law and arguing facts not in evidence; (4) he was unduly prejudiced during the penalty phase of the trial by misleading jury instructions and arguments of the prosecutor suggesting that if an aggravating factor was found, the only authorized sentences were life without parole or life without parole for twenty-five years; (5) the evidence was insufficient to convict on the wanton endangerment charges; and (6) the convictions on the two wanton endangerment charges are barred by double jeopardy because they merged into the murder convictions.

Only the sixth allegation of error was preserved for appellate review; for all other alleged errors Appellant seeks palpable error review under RCr 10.26. For the reasons explained below, we affirm all of the convictions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the weeks preceding the deaths of Nicole Hiles and Larry Whiteker, Appellant and Nicole experienced serious marital discord and their fifteen-year marriage was in jeopardy. Nicole became romantically involved with Whiteker. Evidence presented at trial demonstrated that Appellant was very upset about

2

that and that he was preoccupied with their relationship to the extent that he monitored their whereabouts.

After Nicole moved out of the marital residence, Appellant threw her belongings onto the lawn and challenged her to come retrieve them. Police were called to keep the peace. Appellant also posted social media messages stating that he had discovered that Nicole was seeing someone else and that "the war has began." On the day of the crimes, Appellant sent intimidating text messages to Nicole. He removed the door handles from Nicole's car and challenged her to come get them. He also made hostile statements about the situation to others. Also on that day, Nicole sought an emergency protective order against Appellant. That evening, Nicole met Whiteker at his workplace and the two left together in Whiteker's truck. At about the same time, Appellant was seen speeding and driving recklessly in his SUV.

A short time later, witness Deborah Collins came upon the scene of the crimes. She found Appellant's SUV, with smoke coming from its engine, crashed into the rear passenger's side of Whiteker's truck. Appellant stood on the ground near his truck, wounded but alive. Collins could see the bodies of Nicole and Whiteker slumped over inside of the truck; both were dead of gunshot wounds. Collins called 911 and while she was on the phone with the dispatcher, Appellant told her, "I killed my wife [and] I shot the homewrecker in there." He also told Collins that he had shot himself. Before being taken to the hospital for treatment, Appellant admitted to police that he had killed Nicole and Whiteker.

3

Investigators concluded that Appellant had crashed his vehicle into the rear quarter panel of Whiteker's pickup, forcing it to spin around and come to a stop. The Commonwealth theorized that Appellant then fired several shots at Nicole and Whiteker, killing them before shooting himself twice, once in the left side of his chest and once in the abdominal area. Appellant survived the self-inflicted wounds, however his colon was destroyed and he has a permanent colostomy.

Appellant was charged with two counts of murder, a capital offense,[2] and two counts of wanton endangerment, a Class D felony. Appellant does not deny that he fired the shots that killed his wife, Nicole, and her friend, Larry Whiteker. Instead, he claimed that his crime was mitigated because he acted under the influence of an extreme emotional disturbance (EED). The jury rejected his EED defense; he was convicted of all charges and sentenced as noted above. This appeal followed as a matter of right.

## II. OPINION TESTIMONY CONCERNING WHETHER APPELLANT WAS ACTING UNDER EED AT THE TIME OF THE SHOOTINGS

Appellant's first argument is that "the Commonwealth repeatedly elicited inadmissible opinion testimony and legal conclusions that [Appellant] was not acting under EED." Appellant concedes that this issue is not preserved but requests review for palpable error under RCr 10.26. Appellant cites the testimony of four witnesses: Police Officer Tony Stigers; Officer Brian Cochran,

---

[2] The Commonwealth did not seek the death penalty.

a crime scene specialist; Dr. Timothy Fritz; and Paramedic Ken Ball. We begin with a summary of the cited testimony.

## A. Officer Stigers

Officer Stigers was one of the police officers who responded to the crime scene. His testimony for the Commonwealth recounted his investigatory activities on the night of the crimes. On cross-examination, Appellant's attorney asked Stigers if he could ascertain Appellant's state of mind during the shooting. Stigers responded that he could not say whether Appellant was acting under EED at the time of the shooting.

Upon redirect, to follow-up on that line of inquiry, the Commonwealth asked the following:

> **Commonwealth:** So let's deal with that, in your investigation. Did I understand you to testify that Shaun Hiles, immediately after he killed these two people, was calm in his demeanor?
>
> **Stigers:** Yes, Sir.
>
> **Commonwealth:** He was not showing any emotions?
>
> **Stigers:** No, Sir.
>
> **Commonwealth:** He didn't cry to you that I became enraged, and I was out of my mind when I shot and killed these people, did he? In fact, he coolly and calmly told you that he had just killed two people, is that correct?
>
> **Stigers:** That's correct.

Appellant also cites as improper the section of Stiger's testimony in which the Commonwealth elicited Stiger's opinion that, because Appellant tore off the door handles of Nicole's car and bragged about it, he must have acted intentionally when he shot Nicole and Whiteker.

5

## B. Officer Cochran

Officer Cochran is a crime scene specialist who investigated the shooting. Cochran surmised upon direct examination that there had been a "concentrated line of [gun] fire" directed toward the two victims. On cross-examination, Cochran explained that he was not testifying about Appellant's state of mind, only the direction of the gunfire.

Then, upon re-direct and in response to Appellant's inquiry, the Commonwealth asked Cochran how he might go about determining someone's mental state:

> **Cochran:** There's a lot of background information that goes in. It's generally not a crime scene aspect, it's a lot of background work; talking to folks and things of that nature.
>
> **Commonwealth:** So if I'm hearing what you're saying, you investigate the circumstances both before and after the act, and based on that, a determination of state of mind is made?
>
> **Cochran:** That's correct; this is a small component of that overall determination.
>
> **Commonwealth:** And what you've determined here, as it goes to state of mind, is whoever was firing this weapon, knew what they were doing, because they fired a concentrated set of bullets, didn't they?
>
> **Cochran:** I would say it's in a very controlled manner.

## C. Dr. Fritz

Dr. Fritz treated Appellant's wounds at the hospital. Fritz described Appellant as "combative and *in extremis*," behavior he considered consistent with someone who had suffered a significant wound to the chest. The Commonwealth then asked Fritz if Appellant had shown "any remorse or any type of emotion whatsoever in regard" to having just killed two people. Fritz

6

responded, "We were not discussing that situation." He said Appellant made no mention of the circumstances surrounding his injury.

The Commonwealth again asked if Appellant was "in any way remorseful or emotional." Fritz responded that Appellant was "emotional consistent with someone shot in the chest, he was appropriately upset."

## D. Ken Ball

Ball is a paramedic who treated Appellant at the scene of the shootings. Over Appellant's objection, Ball was permitted to testify concerning Appellant's vital signs immediately after the shooting. After Ball read off the medical information, the prosecutor stated that the readings did not seem abnormal, and in regards to the blood pressure reading stated, "In fact, I should have as good, correct." Ball confirmed the accuracy of that conclusion.

## E. Analysis

Appellant casts the foregoing testimony as testimony of non-expert witnesses expressing, in violation of KRE 701, opinions that Appellant was not acting under EED at the time of the shootings. He concedes that this issue is not preserved for appellate review. "Under RCr 10.26, we may grant relief for an unpreserved error when the error is: (1) palpable; (2) affects the substantial rights of a party; and (3) has caused a manifest injustice." *Spears v. Commonwealth*, 448 S.W.3d 781, 791 (Ky. 2014) (citing *Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 2009)).

For an error to be palpable, "it must be easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky.

7

2006). "Implicit in the concept of palpable error correction is that the error is so obvious that the trial court was remiss in failing to act upon it *sua sponte*." *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017).

"'Manifest' injustice requires showing a probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law, i.e., the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." *Spears*, 448 S.W.3d at 791 (citing Martin *v. Commonwealth*, 207 S.W.3d 1, 3–4 (Ky. 2006)).

KRE 701 states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

(a) Rationally based on the perception of the witness;
(b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and
(c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Our review of the testimony cited by Appellant as improper opinion evidence exposes the inaccuracy of Appellant's initial premise that the Commonwealth "repeatedly elicited inadmissible opinion testimony and legal conclusions that Shaun was not acting under EED" at the time of the shooting. Fritz and Ball provided no testimony at all that could reasonably be construed as an opinion or conclusion concerning whether Appellant was acting under EED at the time of the shooting.

With regard to the cited testimony of Stigers and Cochran, we first note that it was *Appellant,* during cross-examination, who broached the subject concerning the issue of Appellant's state of mind (presumably in the advancement of his EED defense), and so the cited re-direct testimony is in large part a product of Appellant having previously "opened the door" to the issue by raising it himself on cross-examination.

Professor Lawson describes the concept of "curative admission" or "opening the door" as follows:

> The term "opening the door" describes what happens when one party introduces evidence and another introduces counterproof to refute or contradict the initial evidence ·.... If the first party objects to the counterproof, or loses the case and claims error in admitting it, typically the objection or claim of error is rejected because he opened the door.'

Lawson, *Kentucky Evidence* § 1.10[5], at 43 (quoting Mueller & Kirkpatrick, *Federal Evidence* § 12 (2d ed. 1994)) (ellipsis in original). With Appellant himself having first questioned Stigers and Cochran about Appellant's emotional state-of-mind, the Commonwealth's limited follow-up on redirect falls well within the rule that if one party opens the door to an issue, the opposing party is entitled to follow-up, clarify, and rebut the evidence as raised by his opponent.

Stigers' testimony concerned Appellant's outward, observable demeanor, which is proper testimony. KRE 602 permits a witness to describe another person's "conduct, demeanor, and statements [ ] based upon his or her observations to the extent that the testimony is not otherwise excluded by the Rules of Evidence." *Ordway v. Commonwealth,* 391 S.W.3d 762, 777 (Ky.

9

2013). Similarly, on cross-examination, Cochran specifically disclaimed any ability to testify about Appellant's state of mind. He confined his opinion testimony to the gunshot trajectories. Cochran's only testimony regarding a shooter's mental state was directed toward the manner in which such a sequence of shots might be fired. He gave no opinion concerning the motivation or mental state of the shooter or whether Appellant was acting under EED on this particular occasion.

In summary, we find no error at all within the cited testimony, and so we are unpersuaded that a manifest injustice occurred as a result of the testimony to which Appellant has directed us. RCr 10.26.

## III. TESTIMONY CONCERNING APPELLANT'S DEMEANOR PRIOR TO THE SHOOTING

Appellant contends that palpable error occurred when witness Mark Miller testified that when he saw Appellant earlier on the day of the fatal incident. Appellant was visibly upset and was cursing repeatedly. Appellant also complains that Miller testified that his granddaughter received baby-sitting care at a residence also frequented by Nicole and Whiteker. Miller explained that he had feared for his granddaughter's well-being because "if he [Appellant] goes down to that house, it won't be good." Miller testified that he was so worried about what Appellant might do that he could not sleep that night, and that he ended up at the hospital "because of the stress of the whole situation."

Because EED was Appellant's defense against the murder charges, testimony about his emotional condition in the hours leading up to the killings was decidedly relevant, and probative of a crucial issue in the trial—the emotions that may have motivated Appellant's later behavior. Miller's description of Appellant's demeanor was admissible.

However, Miller's testimony about his concern for his granddaughter's safety and his contemporaneous speculations about what might happen if Appellant went to the residence while Nicole was there, and his subsequent resort to medical assistance because of the stress was all inadmissible as irrelevant, and it should not have been presented. Appellant never objected to the testimony so we are again constrained to palpable error review under RCr 10.26.

As noted above, in order to be entitled to relief under the palpable error standard, a defendant must show that absent the error that there is a reasonable probability that a different result would have occurred, or that the error was so fundamental as to threaten a defendant's entitlement to due process of law, i.e., that the error so seriously affected the fairness, integrity, or public reputation of the proceeding so as to be "shocking or jurisprudentially intolerable." *Spears*, 448 S.W.3d at 791.

We are not persuaded that Miller's irrelevant testimony was so consequential that it affected the verdicts, or that its admission was error so fundamental as to threaten Appellant's entitlement to due process of law, or undermine the fairness, integrity, or public reputation of the proceeding as to

11

be "shocking or jurisprudentially intolerable." Accordingly, we reject Appellant's claim that reversal is required.

## IV. IMPROPER CLOSING ARGUMENT

Appellant contends that the prosecutor engaged in two instances of improper closing arguments. First, he contends that the prosecutor misstated the law applicable to EED. Second, he contends that the prosecutor argued facts not in evidence. Appellant concedes that this argument is not preserved but requests palpable error review under RCr 10.26.

### A. Misstating the Law of EED

In *McClellan v. Commonwealth*, we defined extreme emotional disturbance as:

> a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and *an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation* or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

715 S.W.2d 464, 468–69 (Ky. 1986) (emphasis added). This definition is incorporated into KRS 507.020(1)(a):

> a person shall not be guilty [of murder] if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

12

Appellant argued at trial that the circumstances surrounding the collapse of his marriage provided the reasonable explanation for his violent outburst. While addressing Appellant's EED defense during closing arguments, the prosecutor told the jury that EED did not apply in this case unless there was "some reasonable explanation" for the disturbance, and that by urging the jury to find that he acted under EED, Appellant was asking them "to say going through a divorce [is] somehow explainable as EED." Appellant contends that these remarks to the jury "distorted the law." We disagree.

The prosecutor's statement that Appellant's claim of EED could not stand unless accompanied by a "reasonable explanation" is fundamentally consistent with *McClellan* and KRS 507.020(1)(a). To qualify as EED, the temporary loss of judgment that mitigates a murder charge must have a reasonable explanation that accounts for the temporary loss of sound judgment by a person in the defendant's situation. Moreover, we do not regard the prosecutor's argument as an attempt to explain the law to the jury. Rather, we see it as simply a response to Appellant's contrary assertion, an attempt to persuade the jury that the rather common stress of going through a divorce, even under the difficult circumstances faced by Appellant, would not reasonably explain Appellant's loss of judgment, causing him to "act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes."

13

In summary, Appellant overstates the significance of the prosecutor's remarks. The prosecutor's comment did not distort the law applicable to EED. We see no error here.

## B. Arguing of Facts not in Evidence

Appellant also contends that the prosecutor's closing argument urged the jury to consider facts not in evidence. Although an attempt to commit suicide may be the most plausible explanation for the fact that Appellant shot himself in the chest and the abdomen, the prosecutor challenged that hypothesis with the suggestion that Appellant may have intended only to wound himself. The prosecutor argued to the jury, "I do know one thing, if I had that marksmanship ability that he did and I wanted to kill myself, I would've done it, that gun barrel would have gone in my mouth or up against my heart."

Appellant contends that no evidence at trial supported the prosecutor's charge that Appellant was a skilled marksman, and thus the prosecutor improperly interjected that fact. "[Attorneys] may draw reasonable inferences from the evidence and propound their explanations of the evidence and why the evidence supports their respective theories of the case. However, they may not argue facts that are not in evidence or reasonably inferable from the evidence." *Garrett v. Commonwealth*, 48 S.W.3d 6, 16 (Ky. 2001)(citations omitted).

We disagree with Appellant's contention. Evidence indicated that he had a concealed carry license which requires a basic level of competence with firearms. The proficiency of his marksmanship was evidenced by the fact that

14

he targeted both Nicole and Whiteker and he hit both of them. The prosecutor did not attribute to Appellant a greater level of marksmanship than that which could be reasonably inferred from the evidence. We find no error in that aspect of the prosecutor's closing argument.

## V. PENALTY PHASE ARGUMENTS AND INSTRUCTIONS

Appellant next contends that the penalty phase jury instructions were configured so as to compel the jurors to impose either life without parole or life without parole for 25 years if it found the existence of an aggravating factor, thereby preventing the jury from imposing the lesser alternatives of either: 1) a term of imprisonment for life; or 2) imprisonment for a term of not less than 20 nor more than 50 years. The jury found the existence of the aggravating factor, that Appellant's acts were intentional and resulted in multiple deaths, and fixed his sentence for each death at life without the possibility of parole. Appellant concedes that this issue is not preserved but requests palpable error review pursuant to RCr 10.26.

### A. The Instructions

The penalty phase instructions for both the Nicole and Whiteker murders contain the same alleged defect. In order to illustrate the alleged error we use the penalty phase instructions applicable to Whiteker. Instruction No. 5 sets forth the authorized sentences for capital murder and clearly indicated the full range of possible sentences:

INSTRUCTION NO. 5

MURDER

15

You may fix the Defendant's punishment for the Murder of Larry Whiteker at:

(1) Confinement in the penitentiary for not less than twenty (20) years nor more than fifty (50) years;
OR,
(2) Confinement in the penitentiary for life;
OR,
(3) Confinement in the penitentiary for life without benefit of probation or parole until he has served a minimum of twenty-five (25) years of his sentence;
OR,
(4) Confinement in the penitentiary for life without benefit of probation or parole.

But you cannot fix his sentence at confinement in the penitentiary for life without benefit of probation or parole, or at confinement in the penitentiary for life without benefit of probation or parole until he has served a minimum of twenty-five (25) years of his sentence, unless you are satisfied from the evidence beyond a reasonable doubt that the statement listed in Instruction No. 3 (Aggravating Circumstance) is true in its entirety, in which event you must state in writing, signed by the foreman, that you find the aggravating circumstance to be true beyond a reasonable doubt.

You shall use Verdict Form "2" in reaching your verdict under this Instruction. Continue to Instruction 6.

The latter portion of Verdict Form No. 2 contains the alleged error:

16

## VERDICT FORM NO. "2"
## MURDER
### NO.1

We, the jury, fix the Defendant Shaun E. Hiles' punishment for the offense of Murder of Larry Whiteker at:

Confinement in the penitentiary for not less than twenty (20) years nor more than fifty (50) years

_____ years

_____
Foreperson

### NO. 2

We, the jury, fix the Defendant Shaun E. Hiles' punishment for the Murder of Larry Whiteker at confinement in the penitentiary for life.

_____
Foreperson

### NO. 3

We, the jury, find beyond a reasonable doubt that the aggravating circumstance described in Instruction No. 3, "The offense of Murder was committed, and Defendant's act or acts of killing were intentional and resulted in multiple deaths" (CLEARLY CIRCLE ONE OF THE FOLLOWING):

HAS *[Circled]*

HAS NOT

been proven from the evidence beyond a reasonable doubt.

We, the jury, fix the Defendant Shaun E. Hiles's punishment for the Murder of Larry Whiteker at: (CLEARLY CIRCLE A. or B.)

A. Confinement in the penitentiary for life without benefit of probation or parole until he has served a minimum of twenty-five (25) years of his sentence;

OR,

B. Confinement in the penitentiary for life without benefit of probation or parole. *[B. was circled by the Jury]*

17

## B. The Prosecutor's Erroneous Statement

Appellant further contends that the error was compounded based upon the Commonwealth's misleading statement during its closing argument concerning the ramifications of a finding of an aggravating factor:

> In other words, the defendant committed the acts intentionally and did it result in multiple deaths? If you start there and you apply the law that you swore you would apply, *then you've got but two options out of the four,* and that is, as shown on down the page, A or B, *either life without the benefit of probation or parole or life without parole, period.*

## C. Analysis

We begin by noting that the prosecutor's statement that if the jury found an aggravating factor "then you've got but two options out of the four, and that is, as shown on down the page, A or B, either life without the benefit of probation or parole or life without parole, period" is an egregious misstatement of the relevant sentencing law and indeed is utterly contradicted by Instruction No. 5 as set forth above. In fact, contrary to the prosecutor's statement, if a capital case jury finds an aggravating circumstance, it need not impose a sentence authorized only in the event of the finding of an aggravator; rather, even in that instance it may still impose a sentence authorized in the absence of the finding of an aggravator. See *Dunlap v. Commonwealth,* 435 S.W.3d 537, 610 (Ky. 2013). The prosecutor's statement was thus erroneous.

18

With regard to the configuration of the jury instructions, Verdict Form 2 first gives the jury an opportunity to impose a non-capital sentence of a term of years or life. Only if it refrains from doing that does it then move to ascertaining the presence of an aggravating factor, and at this point, the instructions are indeed flawed. As guided by the instructions, if the jury determines the existence of an aggravating factor, it then has only the option of two capital case sentencing ranges: life without parole or life without parole for twenty-five years (the Commonwealth did not seek the death penalty in this case).

If the instructions are faithfully followed, the jury that finds the existence of an aggravating factor, such as multiple deaths, is limited to two sentencing options: life without parole or life without parole for twenty-five years. That is an incorrect presentation of the applicable sentencing options. Under the statutory scheme for capital offense sentencing, even after finding a capital offense sentencing aggravator, the jury may still recommend a sentence of imprisonment for a term of years (not less than twenty nor more than fifty), or imprisonment for life. *Dunlap* at 610. The instructions should have presented the jury with the additional options of fixing a sentence of imprisonment for a term of years or for life, even if the jury found the presence of an aggravating factor.

We agree with Appellant that the jury instructions and the prosecutor's statement are both erroneous. Erroneous jury instructions are presumed prejudicial. *Harp v. Commonwealth*, 266 S.W.3d 813, 818 (Ky. 2008). "Of

19

course, that presumption can be successfully rebutted by showing that the error 'did not affect the verdict or judgment.'" *Id.* Clearly, the prosecutor compounded the problem by emphasizing the erroneous instruction in his closing argument.

Nevertheless, under the applicable standard for unpreserved claims of error, we are not persuaded that manifest injustice occurred, given the facts of this case. Most compelling is the fact that after the jury found the aggravating factor, it by-passed the lower sentencing option—life without parole for twenty-five years—and instead selected the higher sentence of life without the possibility of parole, the greatest sentence possible in this case. From this unique circumstance, logic dictates that if the jury were otherwise inclined toward the lesser sentences of imprisonment for life of a term of years, then it would have chosen the lesser of the two sentencing options before it: life without parole for twenty-five years. Having rejected that lesser option, we see no realistic prospect that the jury might have chosen an even lesser alternative of either imprisonment for life or a term of years which should have been before it.

We are also influenced by other aspects of the jury instructions which informed the jurors that their full range of sentencing options included life imprisonment and imprisonment for a term of years. Jury Instruction 5 specifically informed the jury that these sentencing options were authorized sentences. Further, a different aspect of the way Verdict Form 2 was structured arguably favored Appellant in that the jury was first invited to

20

recommend a term of years or life, and only then was directed to move to the aggravating factor section with its capital sentencing options. In other words, if the jury had been inclined to recommend a sentence of fifty years (or some other term of years), it could have done that in the first section of Jury Form 2 and in that event, it would never have reached the erroneous capital sentencing section further down the page.

While we agree that the jury instructions contained flaws and that the prosecutor misstated the jury's sentencing options upon the finding of aggravating circumstances, these errors were never brought to the attention of the trial court. We are convinced that these unpreserved errors did not affect the ultimate sentencing decision made by the jury, and we are convinced that these unpreserved errors were not so fundamental so as to deprive Appellant of his right to due process of law. The errors did not fundamentally affect the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." *Spears, supra.* Accordingly, we are satisfied that the errors did not cause manifest injustice so as to require reversal of the judgment under RCr 10.26.

## VI. APPELLANT WAS NOT ENTITLED TO A DIRECTED VERDICT ON THE WANTON ENDANGERMENT CHARGES

Appellant's convictions for wanton endangerment are predicated upon the allegations that he intentionally crashed his SUV into Whiteker's truck, thus wantonly endangering the occupants of that vehicle, Nicole and Whiteker. Appellant argues that he was entitled to a directed verdict on the two wanton

endangerment charges. He concedes that the issue is not preserved for appellate review but requests review nonetheless under the palpable error standard.

KRS 508.060(1) provides that:

A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person.

KRS 501.020(3) defines wantonly as follows:

"Wantonly" -- A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.

To prove these charges, the Commonwealth presented the testimony of an automobile collision reconstructionist who opined that when Appellant's SUV crashed into Whiteker's truck, both vehicles were traveling on a narrow country roadway at a speed of more than seventy miles per hour. The expert deduced that when Whiteker braked to turn right onto a second narrow road, Appellant caught up and rammed into the right rear side of the Whiteker vehicle, spinning it to a stop. In his brief, Appellant frames his argument as follows:

[t]here was no evidence that Shaun was acting wantonly when he hit Whiteker's pickup truck. To the contrary, the Commonwealth called accident reconstructionist Scott Conrad to testify that

22

Shaun's collision with Whiteker appeared to be the result of an *intentional* hit.

(Emphasis in original). As we construe the argument, Appellant contends that he could not be convicted of wanton endangerment because, as the Commonwealth's evidence establishes, he was acting intentionally rather than wantonly, when he crashed his SUV into Whiteker's occupied pickup.

We find no basis to support the proposition suggested by Appellant. The definition of wanton conduct explicitly embodies the notion that the defendant "is aware of and consciously disregards a substantial and unjustifiable risk" entailed by his dangerous behavior, but then proceeds to engage in the conduct despite that risk. The quintessential example of wanton conduct is intentionally firing a gun into a crowd or intentionally throwing a bomb into an occupied building.

Upon viewing the evidence in the light most favorable to the Commonwealth, a reasonable jury could easily conclude that Appellant intentionally crashed into Whiteker's truck and that he was at that time aware of substantial risk created by his conduct and yet he consciously disregarded those risks and proceeded nonetheless. Appellant was not entitled to a directed verdict on the wanton endangerment charges regardless of his failure to preserve the issue. It follows that Appellant is not entitled to relief under the manifest injustice standard of RCr 10.26

## VII. THE WANTON ENDANGERMENT CONVICTIONS ARE NOT BARRED BY DOUBLE JEOPARDY

23

Finally, Appellant contends his convictions for murdering Nicole and Whiteker and for wantonly endangering them violate the statutory double jeopardy provisions of KRS 505.020(1). Specifically, he argues that "the act of slamming into Whiteker's truck and shooting the occupants was one event, uninterrupted by legal process and cannot be prosecuted as two separate crimes[.]"

KRS 505.020(1) provides as follows:

(1) When a single course of conduct of a defendant may establish the commission of more than one (1) offense, he may be prosecuted for each such offense. He may not, however, be convicted of more than one (1) offense when:

> (a) One offense is included in the other, as defined in subsection (2); or

> (b) Inconsistent findings of fact are required to establish the commission of the offenses; or

> (c) The offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was uninterrupted by legal process, unless the law expressly provides that specific periods of such conduct constitute separate offenses.

Appellant does not elaborate upon his parsing of why KRS 505.020(1) would preclude convictions for both wanton endangerment and murder under the facts of this case; however, it is clear that the plain language of the statute permits prosecutions for both wanton endangerment and murder under the circumstances presented here.

The statute begins by accentuating this general rule: When a single course of conduct of a defendant may establish the commission of more than one (1) offense, he may be prosecuted for each such offense. Assuming,

24

therefore, that Appellant's conduct of crashing his vehicle into Whiteker's truck and then shooting the occupants is but a single course of conduct, if two offenses may be established by the conduct, then he may be prosecuted for both. Plainly, the ramming of the occupied truck establishes the two offenses of wanton endangerment and the separate act of shooting the occupants during the same course of conduct establishes the two offenses of murder.

The remainder of KRS 505.020(1) proceeds to establish exceptions to the general rule. A defendant may not be convicted for two (or more) crimes for the same course of conduct if (a) one of the crimes is a lesser included offense of the other; (b) inconsistent facts would have to be reached to convict the defendant of both of the crimes; or (c) the offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was uninterrupted by legal process, unless the law expressly provides that specific periods of such conduct constitute separate offenses.

Subsection (a) does not apply because the wanton endangerment charges are not, under these circumstances, a lesser included offense of the murder charges; indeed the wanton endangerment charges resulted from Appellant's crashing his vehicle into Whiteker's vehicle whereas the murder charges involved the entirely separate event of his shooting of the victims. As we explained in *Spicer v. Commonwealth,* KRS 505.020(1) "does not bar the prosecution or conviction upon multiple offenses arising out of a single course of conduct when the facts establish that two or more separate and distinct attacks occurred during the episode of criminal behavior. [F]or multiple

25

convictions to be proper, there must have been a cognizable lapse in his course of conduct during which the defendant could have reflected upon his conduct, if only momentarily, and formed the intent to commit additional acts." 442 S.W.3d 26, 31 (Ky. 2014) (citing *Kiper v. Commonwealth*, 333 S.w.3d 736, 745 (Ky. 2012)).

Subsection (b) similarly does not apply because the jury need not have reached inconsistent facts in order to have convicted Appellant under each of the sets of charges. Finally, Subsection (c) does not apply because it applies only to offenses "designed to prohibit a continuing course of conduct[.]" Unlike, for example, the crime of the offense of nonsupport of a dependent, neither the crimes of murder nor wanton endangerment were designed by the legislature to prohibit a continuing course of conduct. Accordingly, this subsection is inapplicable. *Welborn v. Commonwealth*, 157 S.W.3d 608, 612 (Ky. 2005)

In summary, Appellant's convictions for the multiple crimes of murder and wanton endangerment are not barred by KRS 505.020(1).

## VIII. CONCLUSION

For the foregoing reasons, the judgment of the Grant Circuit Court is affirmed.

All sitting. All concur.

26

COUNSEL FOR APPELLANT:

Erin Hoffman Yang
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky
David Bryan Abner
Assistant Attorney General